482 So.2d 422 (1985)
NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY, Appellant,
v.
Alfred MARCHESANO and Doris Marchesano, Appellees.
No. 85-694.
District Court of Appeal of Florida, Second District.
December 20, 1985.
Rehearing Denied February 5, 1986.
*423 A.H. Lane and Donald G. Jacobsen of Lane, Trohn, Clarke, Bertrand & Williams, P.A., Lakeland, for appellant.
A.R. Mander, III of Greenfelder & Mander, P.A., Dade City, for appellees.
LEHAN, Judge.
Defendant insurer appeals from a declaratory judgment which found the insurer obligated to provide uninsured motorist coverage to plaintiff insured in the amount of the insured's $100,000/$300,000 bodily injury liability insurance limits notwithstanding the $10,000/$20,000 uninsured motorist limits specified in the insurance policy. We reverse.
The insurer argues on appeal that the declaratory judgment was erroneous because, first, the insured had signed an insurance application form stating that those higher limits were offered but he selected lower $10,000/$20,000 limits, and, second, the insured thereafter received in the mail a notification sent by the insurer pursuant to section 627.727(1), Florida Statutes (1982), in a form approved by the Florida Department of Insurance, informing him of his option to purchase uninsured motorist coverage in an amount up to his bodily injury coverage limits, and he had not exercised the option. The judgment followed special jury verdicts which found that plaintiff did not knowingly reject those higher limits when purchasing the policy and that the insurer gave the insured the foregoing subsequent statutorily required notification. We conclude that the first argument of the insurer does not require reversal but that the second argument does.
We deal initially with the first argument. The portion of the application directly above the insured's signature does reflect that those higher uninsured motorist limits were offered and that the insured selected $10,000/$20,000 limits. But there was testimony by the insured which could have *424 been construed by the jury to say that at the time the insurance was purchased the insurer's agent had, in contravention of the insurer's statutory duty, see Realin v. State Farm Fire & Casualty Co., 418 So.2d 431 (Fla. 3d DCA 1982), failed to inform the insured of the availability of those higher limits and failed to offer those limits and that the insured did not know of them. The insurer argues that, although its agent did not recall the details of his conversation with the insured immediately preceding the signing of the application, there was evidence that the agent's routine business practice was to so inform insureds. However, there was evidence on the basis of which the jury could have concluded that the agent did not entirely follow his routine business practice. That evidence was that the agent, inconsistent with that practice, failed to check boxes on the insurance application to indicate more fully whether or not the customer wished to purchase uninsured motorist coverage of specific limits or whether the customer wished to reject uninsured motorist coverage altogether.
In Jackson v. State Farm Fire & Casualty Co., 469 So.2d 191 (Fla. 2d DCA 1985), we concluded that an insurer may present a prima facie case of no uninsured motorist coverage by introducing evidence of a signed rejection of that coverage. However, in contrast to the facts of the case at hand, the holding for the insurer in Jackson was based upon the premise of there being no relevant evidence, other than the signed rejection form, as to whether or not the insured knowingly rejected uninsured motorist coverage.
The case at hand presents the issue of whether a signed rejection of limits of uninsured motorist coverage equal to the insured's bodily injury liability limits is binding upon an insured who later disavows that rejection when there is no showing of any circumstances which had prevented the insured from reading what he signed. We construe the insured's signed acknowledgment that "Uninsured Motorist Coverage has been explained to me and I understand I can purchase up to $100,000/$300,000 limits" (his bodily injury coverage), which immediately preceded "I wish Uninsured Motorist Coverage with limits of $10,000/$20,000 bodily injury" on the insurance application to be a rejection of such $100,000/$300,000 limits. That is, a rejection of higher limits may consist of a selection of lower limits after receipt of an offer of the higher limits.
We must conclude that the signed rejection in this case was not absolutely binding upon the insured. As the Florida Supreme Court said in Kimbrell v. Great American Insurance Co., 420 So.2d 1086, 1089 (Fla. 1982), "[T]he fact that the insurer maintains in its files evidence of an offer and a selection is relevant but not crucial to a finding that a knowing selection was made." The Third District Court of Appeal in Zisook v. State Farm Mutual Automobile Insurance Co., 440 So.2d 452, 454 (Fla. 3d DCA 1983), said, "An informed rejection of uninsured motor vehicle coverage cannot, without extrinsic evidence, be implied from the insured's signature on the application for uninsured motor vehicle coverage." See also Aetna Casualty & Surety Co. v. Fulton, 362 So.2d 364 (Fla. 4th DCA 1978). We do not conclude that the prima facie evidence of a knowing rejection provided by the written rejection could not be rebutted, as the jury found it was here, by the type of testimony of the insured described above.
We recognize the general principle that in a contract case a person who has signed a document is presumed to have known, and cannot deny, its contents. That principle was followed by the Third District Court of Appeal in Alejano v. Hartford Accident & Indemnity Co., 378 So.2d 104 (Fla. 3d DCA 1979), an uninsured motorist coverage case. However, the Alejano opinion does not show the type of document, or the wording thereof, which was involved.
Kimbrell, Zisook, and Fulton all appear to reflect a perception of legislative intent to place a heavy duty upon insurers to obtain a knowing rejection of statutorily *425 provided for uninsured motorist limits and to reflect a public policy in Florida to favor full uninsured motorist coverage for Florida residents, see also Hodges v. National Union Indemnity Co., 249 So.2d 679 (Fla. 1971), unless knowingly rejected by the insured. Therefore, we believe we may not decide this case strictly under the foregoing general contract principle. If we ruled otherwise we would fail to follow the above quoted dictates of Kimbrell in which the Florida Supreme Court also said, "[t]he question of whether an insured has knowingly rejected uninsured motorist coverage or knowingly selected coverage in a lesser amount than that which the insurer is required to make available is an issue to be decided by the trier of fact." 429 So.2d at 1088. The above described premise of Jackson was that there was nothing, other than a rejection signed by the insured, for the trier of fact to weigh.
Any other result in this case would mean that a signed rejection of the type involved here would be fully dispositive as to there having been a knowing rejection, which would be contrary to the dictates of Kimbrell. We recognize the argument that if a signed rejection does not have a binding effect upon the insured who thereafter suffers injuries at the hands of an uninsured motorist, the insured could not only profit from not having read what he signed but, alternatively, could have a convenient loss of memory as to having been offered higher uninsured motorist coverage; he could disavow what was in plain language over his signature on a form which he was not prevented from reading and as to which he was not misled. It might be argued that an insurance company would thereby be in the untenable position of being unable to protect itself against those types of situations unless it went to the extent of taking steps which may be unreasonable to expect, such as, recording or videotaping all conversations when automobile liability insurance is purchased. But we are not saying that an insurer may not otherwise protect itself. It would seem at least difficult to justify a conclusion that an insured who rejects uninsured motorist coverage on a form which he was not prevented from reading and which, in some substantial contrast to the form in the instant case, clearly and abundantly shows that he knew what he was doing, may later disavow that rejection at a time when it becomes in his financial interests to do so.[1] In any event, whether or not we believe generally that motorists who purchase insurance should be relieved of the responsibility for being aware of what they sign is not the point. The point is that our interpretation of the law, as established by the Legislature and the Florida Supreme Court, requires that we disagree with the insurer's first argument under the facts of this case.
We now turn to the second argument of the insurer. Under this argument the insurer contends that even if there had been no knowing, valid rejection of the statutorily required uninsured motorist coverage limits at the time the insurance in this case was purchased, such a rejection occurred later as a result of a form notification, sent to, and received by, the insured with a premium notice, telling of the insured's options as to uninsured motorist *426 coverage as required by section 627.727(1). After having been provided with the notification the insured did not opt for higher uninsured motorist coverage. We agree with this argument.
We conclude that the declaratory judgment was erroneous because it attributed no significant meaning or purpose to the requirement of section 627.727(1) that such notification be sent to the insured with a premium notice. We must presume that the legislature had some purpose in requiring that type of notification and that compliance by an insurer with that requirement was to have some meaning. We must, in construing the statutory requirement, attribute to it a rational and sensible meaning. See Wakulla County v. Davis, 395 So.2d 540, 543 (Fla. 1981). We perceive from the statute the obviously rational and sensible meaning that the notification in this case meant what it was required by section 627.727 to say, i.e., that the insured was given the option of purchasing uninsured motorist coverage with limits up to his bodily injury coverage limits. No purpose would be served by giving such an option to the insured unless there were some significance in his either exercising the option or not. After not exercising the option, the insured should not be entitled to receive what he could have had if he had exercised the option.
At the same time we recognize arguments to the contrary, as outlined below, most of which were made by the insured here. The Legislature, in requiring in section 627.727(1) that such notification of options as to uninsured motorist coverage be given with premium notices at least annually, did not specify any effect of an insurer having done so. It might be argued that the insurer is asking us to read into the statute a meaning that such a mailed notification would cure any prior failure of the insurer to obtain a knowing rejection of the statutorily required uninsured motorist coverage and that such a significant consequence cannot be perceived from any manifested legislative intent. Also, it might be argued that to the extent the statute, by being silent in that respect, is ambiguous as to what effect, if any, such notification shall have, a court's construction must favor the insured and be against the insurer. This argument is that, just as in Hodges, "[a]ll ambiguities and uncertainties [in a policy] are to be resolved in favor of the insured and against the company," 249 So.2d at 680, so also should we resolve against the insurer the statutory ambiguity or omission, or both, involved here as to the effect of that type of notification by an insurer. It might further be argued that we are not entitled to say that the legislative purpose in requiring such notification was not simply to give insureds additional opportunities to know what they were entitled to receive under the law and that they should be no more absolutely bound by their failure to respond to that notification, which might be looked upon by them as "junk mail," than they are absolutely bound, to wit, not at all, by their signed rejections of higher uninsured motorist coverage limits as stated in Kimbrell. Finally, it can be argued that uninsured motorist coverage issues are not necessarily decided by logic perceived by a court but should be governed by the foregoing public policy which is to provide to insureds the fullest uninsured motorist coverage and is to uphold the interests of insureds at the expense of insurers.
Yet we believe that our reversal is correct, proper, and just. It appears to us sensible and rational to conclude that the Legislature, by intending, as we have found, that an insured be bound by his failure to exercise the option provided to him in the written notification required by section 627.727(1), intended to counterbalance the above-referenced heavy burden upon an insurer to obtain a knowing rejection of uninsured motorist coverage limits at the time the insurance was initially purchased.[2] The Legislature thereby placed a *427 countervailing burden upon an insured to pay attention to the subsequent statutorily required notification which in this case was shown to have been in a form approved by the Department of Insurance and which gave an explanation of the nature of uninsured motorist coverage. Accordingly, after an insured's uninsured motorist coverage has been in force for a period of time the insurer who sold the coverage under circumstances like those in this case may in this manner be relieved of its inability to absolutely defeat an insured's disavowal of his rejection of uninsured motorist coverage limits which was made at the time the insurance was purchased. This is surely not unfair to insureds, such as the insured in this case, who at the time of their receipt of the statutorily required notification could no longer be heard to say that they are confronted with a subject new and unknown to them.
Allstate Insurance Co. v. Eckert, 472 So.2d 807 (Fla. 4th DCA 1985), is the only case cited to us and of which we are aware dealing with the effect of a proper notification of this type.[3] In Eckert the insured's reaction to the notification in that case had the effect of establishing a valid rejection of uninsured motorist coverage limits higher than those shown on the policy purchased by the insured. We recognize that Eckert can be distinguished on its facts. The insured in that case made on the notification form sent by the insurer notations to the effect that the insured desired no change in his uninsured motorist coverage, and the insured returned the form to the insurer. But that Eckert was a stronger case in favor of the insurer does not, in our view, detract from the correctness of our holding which is consistent with Eckert as to the effect of an insurer providing the notification provided for by statute.
The 1984 amendment to section 627.727 which is quoted in footnote 1 of this opinion may be construed to deal with newly purchased automobile insurance policies. The issue we deal with in this opinion as to the effect of the statutorily required notifications sent with premium notices will apparently continue to be of significance concerning renewals of existing policies. This issue, therefore, has the potential for having a continued effect upon many automobile insurance policies in this state. We have explained why we believe our holding is correct. But, as we have also explained, there are legitimate arguments against our holding which involves a matter of public policy, albeit basically a matter of judicially perceiving legislative intent as to public policy. The Florida Supreme Court is, of course, the ultimate judicial policy maker and perceiver. Accordingly, we certify to the Florida Supreme Court as a matter of great public importance the following question:
WHEN THERE HAS BEEN A FAILURE OF AN INSURER TO FULFILL ITS STATUTORY DUTY TO OBTAIN FROM AN INSURED AT THE TIME OF THE PURCHASE OF A MOTOR *428 VEHICLE INSURANCE POLICY A KNOWING REJECTION OF UNINSURED MOTORIST COVERAGE LIMITS HIGHER THAN THOSE SPECIFIED IN THE PURCHASED POLICY AND EQUAL TO THE POLICY'S BODILY INJURY LIABILITY LIMITS, WHAT IS THE EFFECT, IF ANY, OF A SUBSEQUENT NOTIFICATION SENT BY THE INSURER TO THE INSURED WITH A PREMIUM NOTICE ADVISING THE INSURED OF HIS OPTIONS AS TO UNINSURED MOTORIST COVERAGE AS REQUIRED BY SECTION 627.727(1), FLORIDA STATUTES (1982)?[4]
Reversed.
CAMPBELL, A.C.J., and SCHOONOVER, J., concur.
NOTES
[1] The 1984 amendment to § 627.727, which came into effect after the facts of this case, includes the following provision:

The rejection or selection of lower limits shall be made on a form approved by the Insurance Commissioner. The form shall fully advise the applicant of the nature of the coverage and shall state that the coverage is equal to bodily injury liability limits unless lower limits are requested or the coverage is rejected. The heading of the form shall be in 12-point bold type and shall state: "You are electing not to purchase certain valuable coverage which protects you and your family or you are purchasing uninsured motorist limits less than your bodily injury liability limits when you sign this form. Please read carefully." If this form is signed by a named insured, it will be conclusively presumed that there was an informed, knowing rejection of coverage or election of lower limits.
Although that 1984 amendment may seem to bear out the result we reach with reference to the first argument of the insurer, we do not employ that amendment as a guide to legislative intent behind the statute before the amendment. See Pfeiffer v. City of Tampa, 470 So.2d 10, 18 (Fla. 2d DCA 1985).
[2] A court's employment of perceived rationality and sensibleness as a guide to ascertaining legislative intent in a case like this is in contrast to a situation where there is a clear manifestation of legislative intent which may not lead to what a court perceives to be a wise result. See, e.g., Pfeiffer v. City of Tampa, 470 So.2d at 17.

We have obtained and examined copies of House and Senate Committee Staff Reports concerning the 1980 amendment to section 627.727 which added the requirement that a notification of an insured's uninsured motorist coverage options be sent with premium notices. Those reports do not manifest any legislative intent contrary to that which is perceived in this opinion.
[3] In Ferrigno v. Progressive American Insurance Co. 426 So.2d 1218 (Fla. 4th DCA 1983) and Ruiz v. Prudential Property and Casualty Insurance Co., 441 So.2d 681 (Fla. 3d DCA 1983), insurers had failed to comply with the statutory mandate to send the notification. Insureds in those cases prevailed against the insurers' contentions that the statutorily provided for uninsured motorist coverage limits were not applicable. Those cases could be argued to support the insurer's second argument in the case at hand. For example, in Ruiz the Third District Court of Appeal, after describing the failure of the insurer to send the requisite notification, said that "therefore" the statutorily provided for uninsured motorist coverage limits were available to the insured in that case. 441 So.2d at 682. It could be argued that unless the Third District had felt that there was some significance to the sending of the notification, there would have been no need for that court to have stated the consequence of an insurer not having sent the notification.
[4] The 1982 statute contained the same provision as that contained in the 1983 and 1984 statutes concerning that type of notification.